IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MEDLINK LEGAL SYSTEMS LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. _____ |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| QIMA INC., QIMA (US), LLC, QIMA LTD., | ) |
| QIMA INSPECTION (SHENZHEN) | ) |
| CO. LTD. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff Medlink Legal Systems LLC ("Medlink"), by and through the undersigned counsel, alleges as follows:

### THE PARTIES

1. Medlink is a Delaware limited liability company with a place of business located at 12550 Biscayne Boulevard, Suite 800, North Miami, Florida 33181.

2. The sole member of Medlink is a citizen of Florida.

3. Defendant QIMA Inc. is a Delaware company with, upon information and belief, a place of business located in Buffalo, New York.

4. Defendant QIMA (US), LLC ("QIMA US") is a Delaware company, with upon information and belief, a place of business located in Buffalo, New York.

5. Defendant QIMA US is a wholly-owned subsidiary of QIMA Inc.

6. Defendant QIMA Ltd. is a Hong Kong company, headquartered in Hong Kong S.A.R., China.

7. Defendant QIMA Inspection (Shenzhen) Co., Ltd. ("QIMA Shenzhen) is a Chinese company.

1

8. Defendant QIMA Ltd. owns 100% of Defendants QIMA Inc. and QIMA Inspection (Shenzhen) Co., Ltd.

9. Defendant QIMA Ltd.'s website (www.qima.com) touts its product inspection global reach "across 85 countries in Asia, Africa, Europe, North and South America" and "guarantee[s] to be at any factory within 48 hours." *See* https://www.qima.com/quality-control-services/product-and-manufacturing-inspections (last accessed Apr. 27, 2023).

10. Upon information and belief, QIMA Ltd.'s global reach refers to its numerous subsidiaries through which it transacts business, including, but not limited to, QIMA, Inc., QIMA US, and QIMA Shenzhen.

11. Upon information and belief, QIMA Shenzhen was formed for purposes of allowing QIMA Ltd. to provide inspection services throughout China.

12. As a wholly-owned subsidiary, QIMA Ltd. exercises direct control over QIMA Shenzhen's operations and QIMA Shenzhen exists for the benefit of QIMA Ltd.

13. QIMA Shenzhen represents itself to new and prospective customers as "QIMA" and not QIMA Inspection (Shenzhen) Co. or in any other manner which would distinguish the operations of QIMA Shenzhen from QIMA Ltd.

14. Furthermore, customers dealing with QIMA Shenzhen use the same website and platform, which is owned and operated by QIMA Ltd., and, upon information and belief, speak to QIMA Ltd. agents for services including, but not limited to, orders, inspection reports, and payments for inspection services (such as the inspection services at issue in this case) which are allegedly performed by QIMA Shenzhen.

15. Upon information and belief, QIMA Inc. and/or QIMA US were/was formed for purposes of allowing QIMA Ltd. to receive inspection orders from customers located in the United

States.

16. As a wholly-owned subsidiary, QIMA Ltd. exercises direct control over QIMA Inc's operations, which means it exercises direct control of QIMA US's operations, and both QIMA Inc. and QIMA US exist for the benefit of QIMA Ltd.

17. Upon information and belief, QIMA Ltd. maintains substantial control over the operations of its subsidiaries. For example, QIMA Ltd. provides the training programs and requirements for its auditors and inspectors. QIMA Ltd. represents to new and prospective clients that its auditors and inspectors are trained a minimum of 100 hours per year.

18. Upon information and belief, QIMA Ltd. is involved in the hiring process for QIMA employees. For example, QIMA Ltd. establishes the strict hiring standards for its inspectors and auditors, "employing only university graduates, with a minimum of five years' experience in quality control and auditing." https://www.qima.com/quality-control-services/product-and-manufacturing-inspections (last accessed Apr. 27, 2023). Importantly, QIMA Ltd. ensures its new and prospective customers that "[e]ach inspector and auditor is native to the area in which they work, with an unparalleled expertise in local business practices." *Id.*

19. Upon information and belief, QIMA Ltd., QIMA Inc., QIMA US, and QIMA Shenzhen operate as a single entity that transacts business on a global scale through the tradename "QIMA" and their independent legal existence is but a mere formality.

20. QIMA Ltd. and QIMA Inc., QIMA US, and QIMA Shenzhen share the same website (www.qima.com), e-mail domain (@qima.com), and registered trademarks, while transacting business under the tradename "QIMA."

21. Upon information and belief, QIMA Ltd.'s misrepresents to new and prospective customers that the employees of QIMA Inc., QIMA US, and QIMA Shenzhen are QIMA Ltd.

3

employees by referring to itself and them as "QIMA."

22. Defendants QIMA Ltd., QIMA Inc., QIMA US, and QIMA Shenzhen are hereinafter referred to as "QIMA" or "Defendants"

23. Upon information and belief, the same WhatsApp number is used to contact any of the Defendants. *See, e.g.,* https://www.qima.com/contact-us (last accessed Apr. 27, 2023).

24. QIMA conducts global operations via, *inter alia*, its QIMAOne mobile application through which QIMA clients across 100+ countries connect and collaborate with QIMA. When clicking the "About Us" link on https://www.qimaone.com/about-our-quality-management-software (last accessed Apr. 27, 2023), the only company identified is "QIMA" which "began in 2005 in Hong Kong"; thus, the "About Us" web page refers to QIMA Ltd.

25. In addition, QIMA's clients utilize the same customer service and support team, which can be contacted using the same phone number found on QIMA's website and the QIMAOne mobile platform.

26. QIMA Ltd.'s website makes numerous references to QIMA's certifications and accreditations received from regulatory bodies such as the U.S. Consumer Product Safety Commission (the "CPSC"). *See* https://www.qima.com/accreditations (last accessed Apr. 27, 2023).

27. Upon information and belief, QIMA Ltd. relies on the certifications and accreditations of its subsidiaries to perform services from which QIMA Ltd. generates substantial revenue. In fact, QIMA US obtained a certification from the CPSC in which it represents to the CPSC that QIMA US is doing business as QIMA. A copy of QIMA US (formerly ANSECO Group, LLC) d/b/a QIMA's CPSC Certification, is attached hereto as Exhibit A.

28. Accordingly, QIMA Ltd. and its subsidiaries, including, but without limitation,

QIMA Inc., QIMA US, and QIMA Shenzhen are one and the same; their corporate structure, a mere formality.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. § 1332 and Medlink seeks damages in excess of $75,000.

30. As Delaware companies, QIMA Inc. and QIMA US are subject to personal jurisdiction in this Court.

31. QIMA Ltd. is subject to the personal jurisdiction of this Court because it (a) operates, conducts, engages in and carries on a business or business venture in this state; (b) it operates as QIMA US and QIMA Inc. which operates as QIMA Ltd.'s alter-ego. QIMA US's and QIMA Inc.'s separate corporate status is formal only and without any semblance of individual identity. As such, QIMA Ltd. is doing business in this jurisdiction through its subsidiaries, QIMA US and QIMA Inc., and as such is subjecting itself to personal jurisdiction in the State of Delaware.

32. QIMA Shenzhen is subject to the personal jurisdiction of this Court, because its alter-ego, QIMA Ltd., operates, conducts, engages in and carries on a business or business ventures in this state through its sister-company and/or affiliate which also is an alter-ego of QIMA Ltd., QIMA US.

33. QIMA Ltd. and QIMA Shenzhen are subject to personal jurisdiction in this Court because: (1) the causes of action set forth herein relate to their activities conducted on behalf of themselves, and (2) they engaged in substantial business directed toward Delaware related to the causes of action set forth herein, including negotiations and business relationships related to Medlink (a Delaware company).

## FACTUAL ALLEGATIONS

34. Medlink is involved in the manufacturing and sale of Personal Protective Equipment ("PPE") for medical and professional uses.

35. QIMA is an independent, certified and licensed quality control company, providing pre-shipment inspection services of products around the globe. QIMA provides a systematic inspection of samples of goods selected randomly from all batches of a product order to ensure that the produce meets the required standards prior to all products being finished and shipped.

36. A non-party by the name of BuKo LLC ("BuKo"), which is a New York limited liability company, is in the business of sourcing, designing, producing, and distributing apparel, including PPE, to state and local government agencies and hospitals.

37. In response to the PPE shortage in this country caused by COVID-19, states sought out private companies to supply PPE to fill the shortages.

38. On or about April 17, 2020, BuKo received a Purchase Order for twenty million units (the "PPE PO") of PPE needed by hospitals during the COVID-19 pandemic, more specifically, Isolation Gowns, AAMI Level 2 ("PPE Gowns").

39. On May 4, 2020, BuKo issued Purchase Order Number 1949 ("PO 1949") to Medlink for the purchase of the 20 million units of PPE Gowns.

40. PO 1949 provides that BuKo would purchase from Medlink the 20 million units of PPE Gowns, at a rate of $6.99 per gown, for a total purchase amount of One Hundred and Thirty-Nine Million Eight Hundred Thousand Dollars and 00/100 ($139,800,000.00), to be paid by BuKo to Medlink. A true and correct copy of PO 1949 is attached hereto as Exhibit B.

41. On or about May 8, 2020, Medlink signed and accepted PO 1949, thereby entering into a valid and enforceable contract with BuKo for the purchase of the PPE Gowns from Medlink.

42.     As a result, and in reliance, of PO 1949, Medlink contacted Chongquing Litai Fashion Group Ltd. ("Litai"), a Chinese manufacturer, to purchase 10 million of the PPE Gowns needed to fulfill PO 1949.

43.     Based upon assurances given by Medlink regarding payment for the PPE Gowns following Medlink's receipt of payment from BuKo, Litai began production of the PPE Gowns.

44.     To ensure the prompt and complete performance of all obligations due and owing by Medlink to BuKo under PO 1949, Medlink's agent Wendy Xiao, work directly with Litai in China to complete the sourcing of the PPE Gowns needed by BuKo. On or about May 18, 2020, while Ms. Xiao was in China working on behalf of Medlink to ensure the timely delivery of the PPE Gowns to the United States, BuKo sought and proposed a modification to PO 1949 whereby BuKo would accept the 20 million PPE Gowns as follows:  two (2) million PPE Gowns would be supplied immediately, eight (8) million PPE Gowns would be supplied on an expedited basis, and the remaining ten (10) million PPE Gowns would be produced after the first ten (10) million PPE Gowns had been procured.

45.     Medlink agreed and accepted BuKo's proposed revision to PO 1949, and the parties confirmed the modification in e-mail exchanges.

46.     As a result of and immediately following the May 18, 2020 telephone conference and modification to the terms of PO 1949, Medlink entered into an agreement with Litai to purchase a total of 5 million PPE Gowns for a total purchase price of $21,000,000.00 (the "PPE Procurement Agreement"). Pursuant to the modification to PO 1949, the first two (2) million PPE Gowns being purchased by Medlink from Litai, for a total purchase price of $8,400,000.00, were for immediate delivery to the United States (the "First Shipment") and the remaining three (3) million PPE gowns, for a total price of $12,600,000.00, were part of the eight (8) Million PPE

Gowns to be delivered to the United States shortly after the First Shipment was received by BuKo (the "Second Shipment"). A true and correct copy of the PPE Procurement Agreement is attached hereto as Exhibit C.

47. Medlink, BuKo, Ms. Xiao, and Litai all continued to regularly correspond and work together to ensure the timely delivery of the PPE Gowns in accordance with PO 1949 including, but without limitation, Medlink's contacting various logistics companies to arrange for the delivery of the PPE Gowns from the Litai factory in China to the United States.

48. In addition, shortly after Medlink executed the PPE Procurement Agreement with Litai, BuKo arranged for QIMA to conduct a pre-shipment inspection of the First Shipment of two (2) million PPE Gowns being purchase by Medlink from Litai pursuant to the PPE Procurement Agreement and in satisfaction of PO 1949.

49. On May 19, 2020, QIMA contacted Ms. Xiao and advised Ms. Xiao that QIMA was appointed by BuKo and that on May 20, 2020, a representative of QIMA would be conducting a pre-shipment inspection of the First Installment of PPE Gowns, which were being sold by Medlink to BuKo. A true and correct copy of the email from QIMA to Ms. Xiao is attached hereto as Exhibit D.

50. On May 20, 2020, QIMA again contacted Ms. Xiao and advised that QIMA had been appointed by BuKo to inspect the production of the First Installment of PPE Gowns on May 21, 2020. A true and correct copy of the e-mails from QIMA to Ms. Xiao confirming the pre-shipment inspection of the PPE Gowns is attached hereto as Composite Exhibit E.

51. QIMA has "Product Inspection Expertise":

## Product Inspection Expertise

QIMA's product inspectors receive regular training in their fields of specialization, including Softlines (/industry-softline) (Garments (/testing/garments-apparel), Footwear (/testing/footwear), Textiles (/testing/textile-fabric-quality-control)), Hardlines (/industry-hardline) (Toys (/testing/toy-safety-and-lab-testing), Electronics & Electrical (/testing/electrical), Cosmetics (/testing/cosmetics), Jewelry (/testing/jewelry), Eyewear (/testing/eyewear)), Food (/food-safety) and other industries.

Our inspections' comprehensive test criteria cover product function, performance, overall appearance and dimensions. For all non-food product inspections, we use the internationally recognized ANSI / ASQ Z1.4 (ISO 2859-1) statistical sampling procedure, ensuring that the inspected products are a representative sample, not a sample that your supplier wants you to test. To determine the sample size and acceptance threshold, we use the international Acceptable Quality Limit (AQL) standard.

https://www.qima.com/quality-control-services/product-and-manufacturing-inspections (last accessed Apr. 27, 2023). As such, QIMA's inspectors know not to eavesdrop on or rely on overheard conversations between production workers. Doing so is antithetical to that standards QIMA follows for conducting inspections.

52. On May 21, 2020, a QIMA representative went to the Litai factory to conduct a pre-shipment inspection of the First Shipment of PPE Gowns.

53. Following its pre-shipment inspection, QIMA published a report, a copy of which was provided to BuKo, in which QIMA falsely stated that the First Shipment of the PPE Gowns failed the inspection (the "Inspection Report"). The Inspection Report stated that QIMA expected that 100% of the total order quantity must be finished and 80% must be packed for the total two (2) million PPE Gown order. QIMA erroneously concluded that 50,000 pieces were unfinished.

54. Immediately after and as a result of QIMA's publishing the false statements in the Inspection Report, on or about May 21, 2020, BuKo notified Medlink that it was terminating the parties' contract and would not be purchasing *any* of the 20,000,000 PPE Gowns from Medlink pursuant to PO 1949.

55. In other words, BuKo terminated its entire $139,800,000.00 contract with Medlink as a result of QIMA's Inspection Report and Medlink's alleged failure to provide the first (2) million PPE Gowns in compliance with the terms of PO 1949.

56. In addition, as a result of the Inspection Report, Medlink was unable to fulfill its payment obligations to Litai and Litai has demanded payment in full for the PPE Procurement Agreement in the amount of $21,000,000.00.

57. After QIMA wrongfully issued the Inspection Report incorrectly stating that 2.5% of the PPE Gowns were unfinished, Ms. Xiao, on behalf of Medlink, contacted QIMA to obtain additional information as to why QIMA determined that the pre-shipment inspection "failed."

58. In response to Ms. Xiao, on May 27, 2020, QIMA *admitted* that its determination that the inspection failed was blatantly false and attempted to undue its error.

59. More specifically, QIMA sent an email, a true and correct copy of which is attached hereto as Exhibit F, to Medlink stating the following:

> I got a reply from the inspector. According to the inspector, about "R-Cloud-2041910",as order qty 200,0000 pcs, we actually found 180,0000 pcs(90%) into export cartons(180000ctns) and other 20,0000pcs(10% ) was unpacked. The factory is a professional manufacturer of isolation gown, daily output is 70,0000 pcs. The factory meanwhile is producing other companies of the same goods (all isolation gown on styles and colors are the same). During our inspection he heard a production worker, not a factory representative said that he was producing 50000 pieces, so he made a mistake to let it as the part semi-finished products for our inspection, so the report is written: "2.5% of the Semi-finished".
> After confirmation for many times, the 50000 pieces with sewing semifinished products were not this order.
> Therefore, please help to correct the report that "7.5% finished & unpacked product" to "10% finished & unpacked product" and cancel "2.5% of the semi-finished product" and inspection result "Passed."

> Thanks
>
> From the above details from the inspector, I will coordinate this with the reports team and let them modify the report accordingly and submit the updated one via the system.

60. In other words, the First Shipment of 2 million PPE Gowns met the standard requested and required by BuKo, and QIMA's inspection report should never have specified "failed."

61. Given the training QIMA's inspectors receive and the standards they follow, the QIMA inspector knew not to rely on a statement by a production worker. Accordingly, no "mistake" occurred and QIMA intentionally relied on the production worker's statement to "fail" the inspection.

62. Further confirming QIMA intentionally acted to have a determination of "fail" for the inspection, it was not until on or about May 28, 2020, that QIMA revised the Inspection Report as "passed."

63. QIMA's untimely efforts to retract its prior false statements in the Inspection Report were simply that, too little too late.

## COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT

64. Medlink realleges paragraphs 1 through 63 above as if fully set forth herein.

65. A valid contractual relationship between Medlink and BuKo prior to QIMA's inducement of BuKo to breach PO 1449.

66. Upon information and belief, QIMA knew that BuKo had a valid contract with Medlink—as apparent from the fact BuKo contracted with QIMA to conduct the inspection at Litai.

67. Upon information and belief, QIMA knew that BuKo would terminate its

11

agreement with Medlink if the Gowns failed inspection.

68. There was no legal justification for the wrongful actions of QIMA during the inspection at Litai.

69. As a result of QIMA's intentional and tortious interference with BuKo's contract with Medlink, Medlink has been damaged in an amount to be determined at trial.

## JURY DEMAND

Medlink hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Medlink requests that this Court enter judgment against QIMA as follows:

A. That QIMA intentionally interfered with Medlink's contract with BuKo;

B. That Medlink is entitled to punitive damages based on QIMA's tortious interference with the contractual relationship between Medlink and BuKo in amounts to be determined at trial;

C. An award to Medlink of pre-judgment and post-judgment interest on all applicable damages;

D. An award to Medlink of such further relief at law or in equity as the Court deems just and proper.

Dated: April 27, 2023                      STAMOULIS & WEINBLATT LLC

*/s/ Richard C. Weinblatt*
Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
800 N. West Street, Third Floor
Wilmington, DE 19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688
stamoulis@swdelaw.com
weinblatt@swdelaw.com

*Attorneys for Plaintiff*
*Medlink Legal Systems LLC*